In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3400

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

*Plaintiff-Appellant,*

*v.*

DAVID WILLIAMS, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-00248-SEB-DKL — **Sarah Evans Barker**, *Judge.*

ARGUED FEBRUARY 23, 2016 — DECIDED AUGUST 8, 2016

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges.*

WOOD, *Chief Judge*. They say every dog has its day. This case is about a dog—specifically, Emma, a black Labrador. Emma lived in Indiana with Anthony and Jeanette Van de Venter, friends of David Williams. When Williams, then visiting the Van de Venters, took Emma outside so that she could relieve herself, she raced off toward an enticing sound and Williams was injured. Before us is the question whether

American Family Mutual Insurance (AmFam), the Van de Venter's home insurer, must cover Williams's medical expenses. AmFam said no and brought this suit for a declaratory judgment to confirm its reading of the policy. The district court, however, found in favor of the Van de Venters and Williams. We affirm.

## I

The relevant facts are undisputed. In October 2012, Williams, a college friend of Anthony Van de Venter, visited the Van de Venters at their home in Monroe County, Indiana. On Tuesday, October 23, 2012, the Van de Venters went to work, leaving Williams at home for the day. Williams was sharing the house with Emma. Before they left, the Van de Venters told Williams that Emma would be fine inside while they were away. If she wanted to go outside, they instructed him, she would ring a bell by the front door, and he should let her out. They said nothing about walking her.

At approximately 10:40 a.m., Williams was watching television when Emma scratched on his bedroom door. He followed her downstairs, clipped a leash to her collar, and accompanied her outside. They returned without incident. Roughly an hour later, Williams heard the bell at the front door ring. He went downstairs again to find Emma by the door, whining. He again affixed the leash to her collar and walked with her into the backyard, away from the road.

As Williams held Emma's leash, a "woof" rang out, shattering the early-afternoon air. That neighborhood dog's bark proved to be, quite literally, worse than its bite: Emma lurched toward the sound, pulling Williams to the ground and seriously injuring his shoulder. Williams sued the Van de Venters,

alleging that they were negligent in, among other things, failing to exercise reasonable care for his safety while he was a guest in their home.

At the time of Williams's injury, the Van de Venters' home was insured by a home-insurance policy with AmFam. The policy included personal liability coverage indemnifying the Van de Venters for compensatory damages for bodily injury and guaranteeing a defense against suits for such damages. The policy also contained a provision stating: "Intra-Insured Suits. We will not cover bodily injury to any insured." In relevant part, the policy defined an "insured" as "any person … legally responsible for a[n] … animal owned by [a named insured or resident relative of a named insured] to which [the policy's personal-liability coverages] apply."

AmFam took the position that these provisions relieved it of the duty to defend or indemnify the Van de Venters. As we noted, the district court rejected its position, and AmFam now appeals.

**II**

We review the district court's decision to grant summary judgment *de novo*. *Steimel v. Wernert*, 832 F.3d 902, 910 (7th Cir. 2016). When reviewing cross-motions for summary judgment, we take the motions one at a time and for each one we construe all facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

AmFam argues that Williams was legally responsible for Emma at the time he was hurt, and for that reason he was an

insured under the policy. As an insured, it concludes, he cannot turn to the policy for coverage of his claim.

In diversity cases where neither party raises a conflict of law issue, federal courts apply the law of the state in which they sit. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). This is such a case. Indiana uses the law of the principal location of the insured risk. *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193 (1971)). The Van de Venters' house is located in Indiana, and so we rely on Indiana law.

If not specifically defined in the policy, clear and unambiguous language is given its ordinary meaning. See *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013). The policy does not define the term "legally responsible," nor does it otherwise indicate that the term has a specific meaning. We therefore turn, as Indiana courts would, to the dictionary. *Id*. at 579. Black's Law Dictionary defines "responsibility" as the "quality, state, or condition of being answerable or accountable; LIABILITY." BLACK'S LAW DICTIONARY 1506 (10th ed. 2014). "Liability," in turn, means "legal responsibility to another or to society, enforceable by civil remedy or criminal punishment." *Id*. at 1053. To the same effect, Merriam-Webster defines "responsible" as "liable or subject to legal review or in case of fault to penalties." MERRIAM-WEBSTER'S THIRD NEW INT'L DICTIONARY 1935 (1986). When used in the legal sense, "responsible" means roughly "subject to some kind of liability."

Indiana law makes two kinds of people legally responsible for animals: owners and keepers. *Ross v. Lowe*, 619 N.E.2d 911, 914 (Ind. 1993) ("An owner or keeper who fails to exercise ... reasonable care may be liable in negligence for the manner of

keeping and controlling the dog."). Indiana Code § 15-20-1-2 defines an "owner" as "a person who possesses, keeps, or harbors a dog." A "keeper, for purposes of imposition of liability, is one who exercises control over an animal on his premises with knowledge of its presence, whether he be an owner, or bailee." *Williams v. Pohlman*, 257 N.E.2d 329, 331 (Ind. Ct. App. 1970). In *Vetor by Weesner v. Vetor*, 634 N.E.2d 513, 515 (Ind. Ct. App. 1994), the court held that a jury could find that the victim's grandparents were a dog's keeper where they had "not simply acquiesced but were intentionally causing the dog to come to their home." *Id*. (noting that they permitted the dog to "roam their farm," fed and watered it, and gave it affection). In order to qualify as a keeper, a person must "undertake[] to manage, control, or care for the animal as [an] owner, in general, is accustomed to do." 3B C.J.S. ANIMALS § 75. The definition therefore "implies ... a substantial number of incidents" and that the person "suppl[ies the dog] with the necessities of life." *Id*. A person "harbors" a dog when she "affords [it] lodging, shelters, or gives refuge ... for a limited purpose or time." *Id*. § 374.

Whatever the limits of these definitions, they are not met here. Because Emma was not on Williams's property, he did not harbor her. Neither did he undertake any control of her that would approximate that of an owner. He did not intentionally cause her to come to any area of the house. Indeed, *she* rang the bell at the front door, signaling that she wished to go outside. He merely attached her leash and accompanied her there. Williams was not responsible for giving Emma any food, water, affection, or other care—and he gave her none. Except for the brief moments when he walked outside with her, he did not interact with Emma at all. Even then, it seems

that his physical control was very limited: their first contest of wills resulted in his injury.

Finally, Williams did not have "possession" of Emma under any traditional definition of the word. He did not "exercise dominion over" Emma; neither did he assert a "right under which" he "exercise[d] control over" her "to the exclusion of all others." *Possession*, BLACK'S LAW DICTIONARY at 1351. Williams was just a houseguest who twice accompanied his host's dog outside as it did its business: he did not possess, keep, or harbor Emma.

AmFam pushes back with the argument that Williams was "legally responsible" for Emma because the Van de Venters granted him a bailment over her. There are several problems with this theory. First, Indiana law seems to consider bailees of animals to be a subset of keepers. See *Williams*, 257 N.E.2d at 331. If Williams was not a keeper, he could not have been a bailee. More fundamentally, Williams does not meet Indiana's requirements for a bailee. "A bailment arises when: (1) personal property belonging to a bailor is delivered into the exclusive possession of the bailee and (2) the property is accepted by the bailee." *Kottlowski v. Bridgestone/Firestone, Inc.*, 670 N.E.2d 78, 82 (Ind. Ct. App. 1996). Delivery requires "full transfer ... of the property to the bailee as to exclude the owner and all other persons." *Id*. "Acceptance requires either an express contract to take the article and later redeliver it, or circumstances from which such a contract can be implied." *Id*.

None of these things happened in this case. Emma was not transferred to Williams at all, let alone to the exclusion of the Van de Venters. Under the undisputed terms of Williams's and the Van de Venters' understanding, Williams and Emma

simply coexisted in the house during the Van de Venters' absence. Neither did Williams expressly or impliedly agree to "take" Emma. Quite literally, Williams let a sleeping dog lie— or do whatever else it was doing. The Van de Venters could have come back at any time and, on a whim, taken her away. They could have sent someone else to walk, feed, or take her out. AmFam wants us to evaluate in isolation the periods during which Williams accompanied Emma outside, disregarding the rest of their day together. But doing so does not accurately reflect their relationship (or lack thereof). Despite spending all day in the same house, Williams's only interactions with Emma took place when he twice affixed a leash to her collar, and for a few minutes, accompanied her outside, exercising at most limited control over her movements.

Even if it were not clear that Williams was not legally responsible for Emma, there would be strong reasons to reject AmFam's owner, keeper, and bailment theories. First, AmFam's theory would lead to absurd results: it would render an unsuspecting bystander legally responsible for the dog whose leash he holds while the dog owner ties her shoe. In fact, nearly anyone who tried to control a dog, even for moments, at the behest of the owner would be legally responsible.

Moreover, fitting Williams's conduct within the term "legally responsible" would take all the bite out of its meaning in the policy. If any person exercising any control over an animal were legally responsible for it under the policy, then nearly all interactions with animals would be excluded from policy coverage. The intra-insured provision was not meant to preclude coverage of every guest or business invitee who drops by the house and even momentarily controls the dog.

Exclusions of coverage must be "clearly expressed to be enforceable." *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012). Where they are not, "the policy will be construed most favorably to the insured." *Id*. (internal citation omitted). If AmFam had intended "legally responsible" to reach so broadly, it should have used more specific language. Indiana follows the rule that "[p]olicy terms are interpreted from the perspective of an ordinary policyholder of average intelligence." *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246 (Ind. 2005). An average policyholder would not consider a houseguest legally responsible for a dog merely because she agreed to take it out to relieve itself, and while doing so, held it by a leash. To the extent reasonable people could differ on the matter, the term must be construed against AmFam. *Id*.

AmFam's citations to non-Indiana authorities fail to support its contention that Indiana would regard Williams as Emma's keeper. See, *e.g.*, *Malik v. Am. Family Mut. Ins. Co.*, 625 N.W.2d 640, 642 (Wis. Ct. App. 2001) (plaintiff legally responsible for dog where he took it to his house and cared for it during owner's week-long vacation); *Van Kleek v. Farmers Ins. Exch.*, 857 N.W.2d 297, 303–04 (Neb. 2014) (dogsitter legally responsible for dog where he was completely responsible for dog's care during owners' four-day vacation). The Utah case the district court found persuasive, *Neztosie v. Meyer*, is closer to this one. See 883 P.2d 920, 921 (Utah 1994). *Neztosie* held that a grandfather who checked on a dog's food and water while its owners were out of town was not a keeper, noting that the term "implies the exercise of a substantial number of the incidents of ownership." *Id.* (citing *McEvoy v. Brown*, 150 N.E.2d 652, 656 (Ill. App. Ct. 1958) ("The casual act of feeding

or watering the dog is not such an act that would constitute keeping or harboring.")).

Finally, AmFam cites a dog's breakfast of Indiana common and municipal law theories, none of which indicates that a person's fleeting physical control over an animal can make her liable for the animal's actions. Williams's use of a leash does not in itself give rise to a legal duty under Indiana law. Even if Williams had what AmFam terms "care, custody, and control" over Emma at the time of his injury, this status is not connected to any theory of liability under Indiana law. AmFam's *res ipsa loquitur* argument is waived. See *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 800 (7th Cir. 2015) (arguments not raised below are waived). And its assorted citations to state, county, and municipal law are inapposite. See, *e.g.*, *Burgin By & Through Akers v. Tolle*, 500 N.E.2d 763, 766 (Ind. Ct. App. 1986) (common-law duty of owner or keeper); *Ross*, 619 N.E.2d at 914 (same); Monroe Cnty. Code §§ 440-12–17 (subjecting owners to potential liability); Bloomington Code § 7.24.040 (penalty paid by owner/guardian).

## III

Williams was not Emma's owner, keeper, or bailee. He was therefore not "legally responsible" for her under Indiana law, not an insured under the policy, and not precluded from coverage by the policy's provision barring intra-insured suits. AmFam owes duties to defend and indemnify the Van de Venters against Williams's suit arising from his injuries. The judgment of the district court is AFFIRMED.

HAMILTON, *Circuit Judge*, concurring. I concur with the court's opinion and judgment holding that American Family must both defend and indemnify the Van de Venters in Williams' claim against them for his injury. The undisputed facts show that when he visited the Van de Venters' home and took their dog for a walk, he was not the dog's owner or keeper under Indiana law. He therefore was not "legally responsible" for the dog and so was not an "insured" whose own injury claim would be excluded from coverage.

There is another, more fundamental reason for rejecting American Family's attempt to deny coverage. Chief Judge Wood's opinion for the court hints at it, noting that the "intra-insured provision was not meant to preclude coverage of every guest or business invitee who drops by the house and even momentarily controls the dog." Supra, at 7. It might be useful for future cases to explain this more fundamental problem in American Family's theory. It has less to do with the tort law of pets and more to do with the law of liability insurance and the scope of the duty to defend.

The Van de Venters' "Gold Star Special Deluxe" homeowners' policy with American Family treats as insureds the Van de Venter family and any other residents of the household who are relatives or minors in their care, if any. The policy also provides that for personal liability coverage:

> insured also means: (1) Any person or organization legally responsible for a watercraft or animal owned by any person included in paragraph a. [the household] to which Section II [liability] Coverages apply. This does not include a person or organization using or having custody of the watercraft or animal in the course

of business or without your specific permis-
sion.

Pl. App. 53 (¶5-b-1). A similar provision treats domestic em-
ployees as insureds, so that they and the Van de Venters
would be covered if a visitor is hurt by the alleged negli-
gence of an employee. *Id*. (¶5-b-2). Both the employee and
the watercraft and pets provisions in this homeowners' poli-
cy are related to the familiar provisions in auto policies that
extend liability coverage, for example, to a friend who drives
an insured vehicle with the owner's permission. From the
point of view of the insureds, the objective is to buy peace of
mind for the threat of liability for injuries to visitors to the
home or caused by operating family vehicles.

Ten pages later in the fine print, the eleventh of twenty li-
ability exclusions says: "We will not cover bodily injury to
any insured." Pl. App. 63. Such "intra-insured" exclusions
prevent fraudulent and collusive claims, for example, by one
family member against another, expecting the deep pocket of
the insurance company to come up with cash. See *Frost v.
Whitbeck*, 654 N.W.2d 225, 235 (Wis. 2002). Applying the "in-
tra-insured" exclusion to Williams' claim in this case, how-
ever, has virtually no precedent and would be contrary to
basic principles of liability insurance.

To begin with, it is hard to imagine how Williams could
be considered "legally responsible" for his own injuries from
the dog's bolt toward the neighbor's dog. It's tempting to
stop there. But American Family has built its entire case by
cooking up an alternative hypothesis. Suppose, it says, that
when Williams took the Van de Venters' dog for a walk, the
dog had injured somebody else, a neighbor. We know that
did not happen, but it might have happened, says American

Family, so let's think it through. We see that American Family's theory for this case collapses from internal contradictions.

First, the injured neighbor sues both the Van de Venters, who own the dog, and visitor Williams, who was actually walking the dog and who they say should have had control of it. The Van de Venters and visitor Williams then tender the neighbor's claim to American Family for a defense. The Van de Venters are covered, of course, and are owed duties of both defense and indemnification. What about a duty to defend visitor Williams? If the insurer or the courts were to get caught up in the details of Williams' relationship with the dog — how long he was staying, his exact duties toward feeding and walking the dog, and even whether he initiated the particular walk or the dog did (see supra at 5) — it would be difficult to decide whether he would be owed a defense and ultimately whether he would be owed a duty of indemnification, which would seem to depend on whether he qualified as a "keeper" under Indiana law. Those questions have occupied most of this litigation.

There is a simpler way to address the problem under American Family's hypothetical: start with the duty of defense, which must be decided first. Under well-established principles of liability insurance, the visitor (Williams) is owed a defense as an insured if someone asserting a claim based on the household dog's actions is merely *trying* to hold him "legally responsible" for the dog's actions. If the neighbor ultimately wins a suit against the visitor, then by definition the visitor is held "legally responsible" and is therefore an insured and should be covered.

But the duty of defense must be decided long before ultimate liability can be decided, and before many factual details can be known. Under the terms of the American Family policy, the visitor is entitled to a defense simply because he *might* be held legally responsible. The hypothetical visitor is entitled to a defense even if the neighbor's claim against the visitor were a sure loser, such as if it were clear the visitor was not the dog's keeper. "It is the nature of the claim, not its merit, which establishes the insurer's duty to defend." *Terre Haute First Nat'l Bank*, 634 N.E.2d at 1339, quoting *Trisler v. Indiana Ins. Co.*, 575 N.E.2d 1021, 1023 (Ind. App. 1991). An "insurance company has a contractual duty to defend unfounded, false and fraudulent suits based upon risks it has insured." *Davidson v. Cincinnati Ins. Co.*, 572 N.E.2d 502, 505 (Ind. App. 1991), citing *Cincinnati Ins. Co. v. Mallon*, 409 N.E.2d 1100, 1105 (Ind. App. 1980) (duty to defend applies to "unfounded, false or fraudulent suits" based upon insured risks); *Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 731 (7th Cir. 2012) (applying Indiana law and reversing summary judgment denying duty to defend).

On the other hand, if the neighbor succeeded on the claim against the visitor, the visitor would have been found "legally responsible" and would fit nicely within the definition of an insured, *at least for that incident*. That interpretation of the policy fits with Indiana law and gives the homeowner and the visitor the peace of mind the homeowner paid for by buying liability insurance.

So far, so good. But how far do we go with this visitor's status as an insured under the "intra-insured" exclusion? It should be limited to a specific *incident* involving the dog. To explain, let's use a different hypothetical. Suppose the

homeowner asks a neighborhood teenager to care for and walk the dog while the owners are away for a few weeks. And suppose the teenager is so involved in the dog's care that she qualifies as a "keeper" under Indiana law. That makes her "legally responsible" for the dog, at least when she takes it for a walk. If the dog hurts another neighbor while she is walking the dog, she is clearly an insured and will be defended and indemnified.

But now suppose the dog-walking teenager, while visiting the house for other purposes, trips and falls on a loose carpet on the stairs. American Family's theory seems to be that the teenager qualifies as an "insured" *for all purposes*. If that were correct, the "intra-insured" exclusion would apply and the homeowners would have no coverage for her claim against them for their negligence. That result would be unjust and completely contrary to the reasonable expectations of all parties, and especially the insured homeowners. Yet that result follows from American Family's logic.

When asked about this hypothetical in oral argument, American Family's counsel said the visiting teenager would not be an "insured" for those purposes. Counsel insisted, though, that if the visiting teenager slipped on the stairs while visiting the house to walk the dog, she would still be an insured so that her own injury claim against the owners would not be covered. (Oral argument at 6:00—9:40.) Counsel did not provide a basis for American Family's proposed line, nor is one evident.

The problem lies in the assumption, implicit in American Family's argument, that an outsider like the dog-walker is an insured either for all purposes or for no purposes. It makes more sense, and fits better with the parties' reasonable ex-

pectations, to say that a person who is an insured based on this notion of legal responsibility for the pet is an insured only with respect to claims against her arising from her arguable legal responsibility for the pet. Surely that would be the insurer's position if the visiting dog-walker tendered to the insurer a claim not related to the dog-walking, such as an allegedly negligent injury to another guest on the premises.

This need to focus on the incident giving rise to the claim becomes obvious in another important context—liability coverage both for injuries *to* domestic employees and for injuries *caused by* domestic employees. The American Family policy here makes clear that it protects the Van de Venters for claims by injured domestic employees. See Pl. App. 62–64 (¶E-2-c; ¶II-D-7; ¶E-1). But as noted, the American Family policy treats domestic employees as insureds where they are alleged to have caused injury to someone else, such as a visitor to the home. Pl. App. 53 (¶5-b-2).

How does the "intra-insured" exception apply to domestic employees? Under American Family's argument here, a domestic employee might be treated as an insured in some instances, so that employee is also an insured. If that's true, there would be no coverage for the Van de Venters if a domestic employee were injured and brought a claim against them. American Family asserted this position at oral argument, but it cannot be the law. It would make the policy's provisions covering claims by domestic employees illusory if not downright fraudulent.

The solution lies in limiting the effect of the provisions treating outsiders (such as visiting dog-walkers and domestic employees) as insureds. They should apply only for claims arising directly from incidents that make them in-

sureds for these very limited purposes. The intra-insured exception should not apply to deny coverage to the homeowners on claims by people who might be deemed insureds for such limited purposes and in such limited circumstances. The purpose of the intra-insured exception simply does not apply to such people. The broader interpretation advocated by American Family would contradict other purposes and provisions in the policy, such as the liability coverage for injuries caused by domestic employees and the broad coverage that homeowners expect for accidents that injure visitors like Williams.

Returning from the hypotheticals to this case, we could also affirm on the simple basis that it makes no sense to treat Williams as if he were "legally responsible" for his own injuries resulting from the dog's actions. Accordingly, he was not an insured for purposes of this incident. The intra-insured exception does not bar coverage of his claim against the Van de Venters.